**NATALIE K. WIGHT, OSB #035576**
United States Attorney
**BENJAMIN T. HICKMAN, DCB #498167**
**SEAN E. MARTIN, OSB #054338**
Assistant United States Attorneys
United States Attorney's Office for the District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2936
benjamin.hickman@usdoj.gov
sean.martin@usdoj.gov
503.727.1000
Attorneys for Defendant United States


## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **FRERES TIMBER, INC.. *et al.*,** | Case No. 6:24-cv-00018-MC |
| Plaintiffs, | **DECLARATION OF JONAH GLADNEY** |
| v. | |
| **THE UNITED STATES,** | |
| Defendant. | |

I, Jonah Gladney, pursuant to 28 U.S.C. § 1746, declare as follows:


Page 1 –    Declaration of Jonah Gladney

1.      I am employed by the U.S. Forest Service. I serve as the

Assistant Zone Fire Management Officer for the Willamette National Forest's

Santiam River Zone.  The Santiam River Zone covers the Detroit and Sweet

Home Ranger Districts—almost 500,000 acres of National Forest System

lands.  In my position, which I have held since 2018, I have responsibility for

supervising fire-response resources including close to 40 individuals who

work on two fire engines and a firefighting hand crew.  I also have

responsibility for formulating fire suppression plans and requesting external

firefighting resources as needed.  In addition, I am able to serve within my

firefighting qualifications as a type 3 Incident Commander.

2.      Since 1998, I have worked for federal and state agencies in the

firefighting realm.  My firefighting experience includes 6 years on hot shot

crews in Alaska and Utah, 7 years as a smokejumper based out of Redmond,

Oregon and West Yellowstone, Montana, and 3 years as a rappeller based out

of Grants Pass, Oregon. All three of these firefighter assignments are

considered elite.

3.      During the Beachie Creek fire in 2020, I took on responsibilities

as the Incident Commander (type 3) from August 17, 2020 to August 23,

2020.  As Incident Commander, I was responsible for managing the full

suppression response to the fire.  I was instructed to manage the response to

the fire to first provide for firefighter and public safety.  A copy of my

Page 2 –     Declaration of Jonah Gladney

Executive Summary of my tenure as Incident Commander is attached to this declaration as Exhibit A.  A copy of my log notes from my command is attached as Exhibit B.

4.      During my command of the Beachie Creek fire, the fire was located in the Opal Creek Wilderness, in rugged and steep terrain about 6 miles north of Detroit, Oregon on the Willamette National Forest.  There were no roads in the area of the fire.  The fire's footprint was approximately 10 acres when I took command.

5.      A significant early priority during my command was determining if it would be safe to establish direct on-the-ground suppression of the fire.  I ordered a hot shot crew to evaluate this issue.  Because there was no road access to the fire, the Zigzag Interagency Hot Shot Crew on August 18 needed to hike several miles off-trail and over extremely rough terrain to access the fire on the ground.  This hot shot crew is a highly trained wildland fire handcrew that specializes in fire suppression work in challenging settings including constructing fire lines and removing vegetation and fuel. Again, a hot shot crew is considered elite, the most highly trained and physically able to perform work from the ground. After these firefighters hiked into the fire, they told me it was not feasible to mount direct ground suppression efforts. Together we explored every option possible to gain access to the fire. Establishing direct flanks to suppress the fire would be too dangerous:  the

Page 3 –      Declaration of Jonah Gladney

slopes were too steep, the fuel loading heavy in the mature unmanaged forest stands with significant heavy down and dead fuel loading, and the chance of roll out great.  By roll out, I mean material such as rocks and tree roots getting knocked loose and endangering firefighters from above.  Construction of a helispot near the fire to allow access for additional firefighters and emergency transport was also not feasible.  That is because of the steep and densely forested terrain and nearby knife ridges that were unsuitable for helispots and because there would be no adequate non-aerial exit route for injured firefighters in this trail-less and unroaded wilderness setting. Relying on aerial resources to remove an injured firefighter, if that was the case, would not be a safe or effective strategy here because of the uncertainties (such as changing weather, mechanical issues, and loss of the resources to other incidents) inherent to use of these resources and priority fires.

6.      In the initial hours of the fire's discovery, smokejumpers were also dispatched, but could not locate a safe place to jump.  Smokejumpers are a special Forest Service suppression resource for wildland fires; they parachute from aircraft to access remote country to fight fires, also one of the three elite resources available.  Smokejumpers when parachuting need a relatively large/open/flat area to safely land, but the Beachie Creek fire was located in a steep sloped dense unmanaged wilderness forest.

Page 4 –      Declaration of Jonah Gladney

7.     The third elite resource is a Forest Service rappel crew who attempted to access the fire in the initial hours after the fire's discovery, but could not find safe rappel locations. I personally flew over the fire with the rappel crew and agreed that there was no safe way to get a rappel crew put in. Rappellers are highly trained specialist firefighters that rappel (via ropes) down from helicopters in order to fight remote wildland fire on the ground. But it is not safe for rappellers to rope down onto a fire site through a dense and complex forest canopy that blocks the ability to see ground conditions from the air.

8.     In light of the safety concerns with direct ground suppression communicated by three different sets of elite ground firefighters—the hot shot crew, smokejumpers, and rappellers—we were concerned it was too dangerous to mount direct ground suppression efforts. Instead, I believed it would be safer and more effective to identify natural and constructed barriers, remote from the fire (and with readier access to roads, ground crews and engines, etc.), as indirect containment lines. On August 19, I discussed the safety concerns and using an "indirect" ground suppression strategy—along with water dumps from aviation resources to contain fire spread—with fire personnel including Agency Administrator David Warnack and Fire Management Officer Brandon Coville. We agreed on this strategy. A copy of the Incident Status Summary I approved on August 21, attached here as

Page 5 –     Declaration of Jonah Gladney

Exhibit C, references this strategy. Dave, Brandon, and I also agreed that transitioning to a nationally-based incident team made good sense to allow detailed forecasting and modeling of expected fire behavior and fire spread, and to focus on strategic planning.

9.     Aviation operations continued during my command to limit or "check" the spread of the fire. Fire behavior and growth remained low, and the fire footprint remained at approximately 10 acres when my command ended on August 23.

10.     On August 23, 2020, I transferred incident command to a National Incident Management Organization led by Michael Quesinberry. I continued to be involved in the Beachie Creek fire response given my responsibilities as Assistant Zone Fire Management Officer.

11.     Based on my training and experience in fire suppression, the use of water dumps from aerial resources will not succeed in extinguishing a fire without accompanying direct ground suppression work. You simply need "boots on the ground" and water alone will not put out a fire. Ground suppression work is needed to dig out fire hotspots that may be sheltered from aerial attack under big logs or deep roots. This is especially true on the west side of the Cascades, where water can roll off steep slopes, fires can smolder deep inside layers of duff, and where water dumps without ground

Page 6 –     Declaration of Jonah Gladney

supervision or recon can push embers and other burning fuels away from the existing fire.

12.    In my judgment, continuous use of aviation resources for water dumps is not likely a cost-effective or safe stand-alone suppression strategy when fire behavior is low, a fire's footprint remains consistent, and direct ground suppression resources have determined coming in on the ground to be unsafe.  Such use of aviation resources is not only expensive (fuel and machinery costs) but can present unnecessary risks to the pilots in helicopters or planes—especially in remote areas or where there are other wildland fires competing for aviation resources to help protect human lives, structures, and other higher values at risk. We in the firefighting realm, when we are unable to attack from the ground and ask aviation to keep a fire in check, call this "transferring risk" (from ground crews to aviation crews) and continually evaluate the appropriateness of such an approach.  As an ATGS (Air Tactical Group Supervisor), I am qualified to supervise aviation over fire incidents.  I evaluate the transfer of risk and take very seriously ensuring the safety of pilots and aviation crews.

13.    Weather conditions (especially visibility), flight-time limits, mechanical issues with aircraft, and competing resource demands from other fires are other factors that undermine the notion that continuous aerial water dumps can be relied upon as a complete suppression strategy.  During my

Page 7 –    Declaration of Jonah Gladney

command of the Beachie Creek fire, I oversaw multiple aviation missions to dump water to check the fire. But at time, aviation resources were reassigned to other fires. For example, on August 20, 2020, an Air Attack plane was reassigned from Beachie Creek to the Green Ridge fire which had become very active. Similarly, on August 21 and 22, the type 1 helicopter was reassigned off Beachie Creek to the Warm Springs fires.

14.    There are no Forest Service directives or requirements specifying that a full suppression response to a wildfire must involve any particular quantity or frequency of aerial water dumps. Nor are there any Forest Service directives or requirements specifying the manner, quantity, or frequency of use of helicopters and other aerial resources in suppressing a wildfire.

15.    In summary, in our full-suppression response to the Beachie Creek fire, we explored <u>every</u> option possible utilizing the variety of resources available. Every tactical decision was evaluated then re-evaluated by skilled fire specialists in an effort to contain the fire. My 25 years in fire suppression and management guides me in making sound decisions ensuring safety first and foremost. Once gaining direct ground access to the fire was determined unsafe and nearly impossible, we utilized aviation as efficiently as possible. I think back continuously and feel very strongly I would not change our

Page 8 –    Declaration of Jonah Gladney

approach. I am as aggressive as they come when suppressing a fire, but not

willing to compromise human life.


Executed on this _1__ day of March, 2024.

JONAH GLADNEY
Digitally signed by JONAH
GLADNEY
Date: 2024.03.01 13:49:56 -08'00'

_____

Jonah Gladney