IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

FRERES TIMBER, INC., and
FRERES LUMBER CO., INC.,

        Plaintiffs,

    v.

THE UNITED STATES,

        Defendant.

_____

Case No. 6:24-cv-00018-MC

OPINION AND ORDER

MCSHANE, Judge:

Plaintiffs Freres Timber and Freres Lumber, sister lumber companies, filed this action against the United States Forest Service, seeking over $30 million in damages under the Federal Tort Claims Act ("FTCA") for lumber and profits lost in the Beachie Creek fire.

The Forest Service now moves to dismiss Plaintiffs' claims, arguing that the challenged decisions fell within the discretionary function exception to the FTCA.[1] Def.'s Mot., ECF No. 8.

Because the challenged decisions fall within the discretionary function exception, this Court lacks jurisdiction, and Plaintiffs' FTCA claims must be dismissed. The Forest Service's Motion is GRANTED.

---

[1] The Forest Service also moves to dismiss Plaintiffs' claims related to two timber-sale contracts, arguing that the Tucker Act and the Contract Disputes Act preclude this Court from exercising jurisdiction over those claims. *See* Def.'s Mot. 33–34, ECF No. 8. Because the Court finds independent and sufficient grounds to dismiss Plaintiffs' case, it does not reach the contract arguments and therefore declines to address them.

## **LEGAL STANDARD**

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a federal court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Ordinarily, where a jurisdictional issue is separable from the merits of a case, the court may determine jurisdiction by the standards of a Rule 12(b)(1) motion." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). In that circumstance, allegations of jurisdictional fact are not afforded presumptive truthfulness and the court may review evidence beyond the complaint without converting the motion into one for summary judgment. *E.g.*, *Young v. U.S.*, 769 F.3d 1047, 1052 (9th Cir. 2014).

However, where a "jurisdictional motion involv[es] factual issues which also go to the merits, the trial court should employ the standard applicable to a motion for summary judgment, as a resolution of the jurisdictional facts is akin to a decision on the merits." *Augustine v. U.S.*, 704 F.2d 1074, 1077 (9th Cir. 1983) (citing *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733–43 (9th Cir. 1979)). "[T]he moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

"Although Plaintiffs bear the initial burden to establish subject matter jurisdiction under the FTCA, it is the government's burden to establish that the discretionary function exception applies." *Young v. U.S.*, 769 F.3d 1047, 1052 (9th Cir. 2014) (original citation omitted).

## **BACKGROUND**

### I.    **The Beachie Creek Fire**

One of the most devasting fires in Oregon's history, the Beachie Creek fire claimed five lives and consumed more than 193,000 acres of public and private land. *See generally* Haglund Decl. Ex. 1, ECF No. 42. The timeline of its destruction is as follows.

On August 16, 2020, the Forest Service detected the onset of the Beachie Creek fire. Haglund Decl. Ex. 7, at 1. The footprint was approximately 10 acres in the Opal Creek Wilderness, around six miles north of Detroit, Oregon. Gladney Decl. ¶ 4, ECF No. 9. The affected area was comprised of steep, rugged terrain and presented multiple hazards, such as off-road operations, potential rolling material, and risk of fatigue from the extended hike required to access the fire. *Id.*; *see also* Gladney Decl. Ex. A, at 4. The Forest Service's initial priority was determining if a direct, on-the-ground attack was feasible. Gladney Decl. ¶ 5. Incident Commander Jonah Gladney testified that this style of "ground suppression" is necessary "to dig out fire hotspots that may be sheltered from aerial attack," particularly "on the west side of the Cascades, where water can roll off steep slopes, fires can smolder deep inside layers of duff, and where water dumps without ground supervision or recon can push embers and other burning fuels away from the existing fire." *Id.* at ¶ 11; *see also* Warnack Decl. ¶ 8, ECF No. 11. Despite this, the remote location of the fire ultimately required the Forest Service to mount "an initial response comprised solely of aerial resources." Gladney Decl. Ex. A, at 5. Three helicopters delivered over 35,000 gallons of water on the fire, one aircraft surveyed the size of the fire, and another was used to dispatch a crew of smokejumpers, although conditions precluded them from finding a safe jump point.[2] *Id.*; Warnack Decl. Ex. E, at 1. More aircrafts and air attacks were ordered, but due to availability and weather, those efforts were cut short. Warnack Decl. Ex. E, at 1.

---

[2] Smokejumpers are specialist firefighters who parachute from aircraft to remote country to fight fires. Gladney Decl. ¶ 6.

On August 17, the Forest Service ordered rappelers to access the fire by helicopter, but again, a safe entry point was inaccessible.[3] Gladney Decl. Ex. B, at 1. The following day, the ZigZag Interagency Hot Shot Crew managed to access the fire by foot, and they concluded that due to steep slopes, heavy fuel loading, and chance of roll out, a direct ground suppression would not be feasible.[4] Gladney Decl. ¶ 5. Helicopters continued throughout the two-day period, delivering over 243,000 gallons of water on the fire. Warnack Decl. Ex. E, at 1.

On August 19, the Forest Service published an Incident Decision through its Wildland Fire Decisions Support System ("WFDSS"). Haglund Decl. Ex. 21. It concluded that there were no benefits to the fire and directed "full suppression" as the Service's course of action. *Id.* at 13, 20. Helicopters continued delivering water on the fire through the next day, despite both helicopters being temporarily down for unscheduled maintenance and one aircraft being reassigned to another fire. Warnack Decl. Ex. E, at 1–2.

By August 20, the fire had maintained its 10-acre footprint. Haglund Decl. Ex. 8, at 1. Incident Commander Gladney reported that "[f]ire growth ha[d] slowed due to effective use of aircraft and moderating weather conditions." *Id.* The second Incident Decision continued to direct "full suppression" and use of aviation resources, but it noted the strategy's vulnerability to resource availability and critical weather events, "east winds for example." Haglund Decl. Ex. 22, at 23, 27. The second Decision also identified that "[f]ire disturbance to the Opal Creek Wilderness could benefit forest health and wilderness values if the fire behavior remains at a low or moderate intensity. However, given complexities associated with expected duration and the

---

[3] Rappelers are specialist firefighters who rappel from helicopters to fight wildland fire on the ground. Gladney Decl. ¶ 7.

[4] The Hot Shot Crew is a highly trained wildland fire hand crew that specializes in fire suppression across challenging settings. Gladney Decl. ¶ 5.

potential for dynamic fire growth during critical fire weather events, and potential impacts to adjacent values at risk, benefits are not commensurate with risk." *Id.* at 13.

From August 21 to August 30, the Forest Service suspended aerial water drops due to limited visibility, reallocation of resources, and minimal fire activity.[5] Warnack Decl., Ex. E at 2–3. They resumed on August 31, delivering over 91,000 gallons of water by the end of September 3. *Id.* at 3. That day, the Forest Service published its third Incident Decision. Haglund Decl. Ex. 23. The fire had grown to 150 acres; the response remained full suppression. *Id.* at 3, 28.

By September 6, the fire had grown to 469 acres. Haglund Decl. Ex. 18, at 1. Aerial drops and indirect-suppression efforts continued, delivering over 119,000 gallons in two days. Warnack Decl., Ex. E, at 4. The Service ordered two specialized aircrafts that could quickly refill their water supply without returning to base, but smoke and poor visibility prevented their deployment. Gales Decl. ¶ 7, ECF No. 13.

By 3:00 p.m. on September 7, all aerial resources were grounded for safety due to an increase in east winds. *Id.* at ¶¶ 7–8. Prior Incident Decisions had assessed weather forecasts and predicted several days of dry east winds, but the modeling failed to anticipate the severity and swiftness of impact. *See* Haglund Decl. Ex. 23, at 41; Coville Decl. Ex. E, ECF No. 10. Strong gusts caused numerous powerlines to crash along the Highway 22 corridor, resulting in a string of small fires. Gales Decl. Ex. A, at 2. At the Incident Command Post, firefighters and neighboring civilians were forced to evacuate before most of the camp burned down. Gales Decl. ¶ 8. The Beachie Creek fire subsequently swallowed the smaller fires and later joined the Lionhead fire, before aggressively spreading down the Santiam Canyon. Gales Decl. Ex. A, at 2.

By the next day, the fire had swelled to 132,450 acres. Haglund Decl. Ex. 20, at 1.

---

[5] With the exception of August 24, when the Forest Service delivered 5,400 gallons on the fire. Haglund Decl. Ex. 24, at 2.

II.    **Plaintiffs**

Plaintiffs are timber companies that own approximately 17,000 acres of timber in and around Little North Santiam Canyon. Compl. ¶ 69, ECF No. 1. Approximately 7,000 of those acres were heavily damaged or destroyed by the Beachie Creek fire, estimated by Plaintiffs to total nearly $30 million in lost value. *Id.* Plaintiffs also purchase timber from lands managed by the Forest Service that were damaged. From the Mansfield and Collawash Timber Sales Contracts, Plaintiffs estimate they lost $3 million in profits and approximately $300,000 in preparation costs. *Id.* at ¶ 70.

Plaintiffs filed this action on January 3, 2024, asserting two negligence claims against the Forest Service under the FTCA. Plaintiffs allege the Forest Service was negligent in responding to the Beachie Creek fire because it "fail[ed] to utilize available helicopter resources to aggressively attack the Beachie Creek Fire during the 14 days when the fire was extremely small . . . despite knowing that the risks of a catastrophic wildfire were increasing and that helicopter resources, if properly deployed, had an extremely high likelihood of success." *Id.* at ¶¶ 73, 78.

## ISSUE

The Forest Service now moves to dismiss this action for lack of subject-matter jurisdiction, arguing that the challenged decisions are immune under the FTCA's discretionary function exception.

On both claims, the Forest Service's Motion is correct.

## DISCUSSION

The FTCA waives the United States' sovereign immunity for tort claims arising out of the negligent conduct of government agents acting within the scope of their employment. 28 U.S.C. § 1346(b)(1). Operationally, Act grants federal courts subject-matter jurisdiction over specific

tort claims, allowing the government to be held liable for negligence "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

This waiver of sovereign immunity excludes, however, "any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function." 28 U.S.C. § 2680(a). The discretionary function exception "marks the boundary between Congress's willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).

Whether the discretionary function exception precludes a court from exercising jurisdiction is determined by a two-pronged test. *See GATX/Airlog Co. v. U.S.*, 286 F.3d 1168, 1173 (9th Cir. 2002).

First, the court inquires whether the challenged actions were discretionary, meaning they "involv[ed] an element of judgment or choice." *E.g.*, *U.S. v. Gaubert*, 499 U.S. 315, 322 (1991) (cleaned up). If the actions were controlled by mandatory policy, there was no discretion, and the exception does not apply. *Id.*

If an element of judgment is involved, then the court assesses "whether that judgement is of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23. "Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." *Id.* at 323 (cleaned up) (quoting *Berkovitz v. U.S.*, 486 U.S. 531, 536–37 (1988)). Where "a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary

act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id.* at 324.

"If the challenged action satisfies both of these two prongs, that action is immune from suit—and federal courts lack subject matter jurisdiction—even if the court thinks the government abused its discretion or made the wrong choice." *E.g.*, *Esquivel v. U.S.*, 21 F.4th 565, 574 (9th Cir. 2021) (original citations omitted).

## I.   **<u>Discretion</u>**

Applying the first prong, the Court asks whether there was a federal statute, regulation, or policy in place that specifically prescribed a course of action for the Forest Service regarding the Beachie Creek fire. *See Miller v. U.S.*, 163 F.3d 591, 594 (9th Cir. 1998). Plaintiffs point to two, arguing that the WFDSS Decisions and wildfire management policy eliminated the Service's discretion in this circumstance. Those arguments fail for multiple reasons.

First, Plaintiffs' reliance on WFDSS Decisions is misplaced. Plaintiffs contend that because those Decisions directed "full suppression," the Forest Service had no discretion to "allow[] firefighting resources to stand idle." Pls.' Resp. 17–18, ECF No. 40. According to Plaintiffs, "full suppression" directs the firefighters "how to fight the fire" because it tells "the agency to 'put the fire out'" and "establishes a timeline for those firefighting actions." *Id.* Not only is Plaintiffs' characterization of the Decisions plainly wrong, but their insinuation that the Forest Service was "idle" is dramatically unfair. The WFDSS Decisions establish only that "full suppression" is the chosen course of action. Specific choices regarding the implementation of that directive are left to the firefighters. No language in the Decision prescribes a specific method of suppression, imposes a specific time constraint in which to accomplish full suppression, or, more pointedly, compels the Forest Service to make a specific number of drops with a specified

number of helicopters. Those judgement calls are left to the discretion of the firefighters. *See Miller*, 163 F.3d at 595 ("while the above standards and procedures outline certain requirements for fire suppression, they do not eliminate discretion because they do not tell firefighters how to fight the fire"). In fact, with respect to aviation operations, the Forest Service is specifically directed that "[a]viation use must be prioritized based on management objectives and probability of success." Robertson Decl. Ex. B, at 323, ECF No. 12. "Risk management is a necessary requirement for the use of any aviation resource" and "must include risk to ground resources, and the risk of not performing the mission, as well as the risk to the aircrew." *Id.* In other words, firefighters are expected to choose when to deploy air resources dependent on individual risk management assessments. That is discretion, and it is telling that Plaintiffs did not present any policy commanding the Service to conduct water drops at a defined pace or quantity.

Moreover, the existence of some mandatory language "does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Miller*, 163 F.3d at 595. In this setting, the consequences of Plaintiff's argument reveal its senselessness. If Plaintiffs were correct, anytime the Forest Service elected "full suppression" as the best course of action, they would be compelled to conduct constant water drops from all available helicopters—regardless of visibility or inclement weather, irrespective of landscape, absent considerations of safety, and completely untethered to changes in resource scarcity. These circumstances inherently dictate discretion, and Plaintiffs' proffered Decisions fail to eliminate that. *See id.* at 595.

Plaintiffs' second theory comes closer, but still fails. Section 5130.3 of the Forest Service Manual ("FSM") restricts the use of wildfire as a natural resource management tool to circumstances where "initial and long-term risk is within acceptable limits as described in the

risk assessment." Hanglund Decl. Ex. 26, at 3. Because the Forest Service determined any benefit of the Beachie Creek fire was not commensurate with the risk, the FSM precluded the Service from "deci[ding] to use the Beachie Creek fire for natural resource management purposes," according to Plaintiffs. Pls.' Resp. 18. Fatal to their argument, however, is the lack of any proof that the Forest Service was improperly "letting the Beachie Creek Fire burn for natural resource purposes." Each Incident Decision directed full suppression and clarified that there was no actionable benefit to the fire. Plaintiffs list of past occasions wherein the Forest Service used wildfire as a resource management tool does not prove that, on this occasion, that is what the Service was doing, particularly where the reports and firefighter testimony conclusively indicate otherwise. The testimony of retired Forest Service worker Frank Carroll, who reviewed the record and derived the "opinion that, more likely than not, the Beachie Creek Fire was not extinguished because the Forest Service chose to use it as a natural resource management tool," similarly fails to meet Plaintiffs' burden. Lastly, even if Plaintiffs could somehow demonstrate that the Forest Service allowed Beach Creek to burn, the Court hesitates to construe that decision as non-discretionary given that section 5130.3 of the FSM requires risk assessments by the Forest Service which inherently implicate an element of judgment.

As a final matter, the Court notes that finding discretion in this context is consistent with other courts in this Circuit. On multiple occasions, past courts have addressed the first prong and concluded that Forest Service decisions regarding the allocation of fire suppression resources are discretionary. *See*, *e.g.*, *Defrees v. U.S.*, 738 F. Supp. 380, 385 (D. Or. 1990) (dismissing plaintiffs' FTCA claim for negligence against the Forest Service because the court found the Service "had considerable discretion in deciding how to allocate suppression resources"); *Parsons v. U.S.*, 811 F. Supp. 1411, 1417 (E.D. Cal. 1992) (dismissing plaintiffs' FTCA claims

for negligence against the Forest Service because the court found "that the challenged actions involved judgment or choice and were, in fact, discretionary acts"); *Miller*, 163 F.3d at 595 (affirming the dismissal of plaintiffs' FTCA claim because the Ninth Circuit agreed "that the Forest Service retained 'considerable discretion in deciding how to allocate suppression resources'"); *Esquivel*, 21 F.4th at 574–75 (affirming the dismissal of plaintiffs' FTCA claims against the Forest Service after concluding that the Forest Service Manual "exude[s] discretion by the Forest Service when determining how best to fight wildland fires"). As notably stated by the Ninth Circuit: "our precedent already establishes that claims involving how the government conducts fire suppression operations are generally barred by the discretionary function exception." *Esquivel*, 21 F.4th at 574.

  For the same reasons, this Court concludes that the Forest Service's actions with respect to the Beachie Creek fire were discretionary. In their Motion, the Forest Service highlights multiple provisions in the FSM echoed in past decisions that entitle firefighters to use their judgment in exercising responsive decision-making:

> Employees are expected and empowered to be creative and decisive, to exercise initiative and accept responsibility, and to use their training, experience, and judgment to implement the agency's mission.
>
> Doctrinal approach goes beyond strict compliance with procedural rules, and promotes risk-based application of wildland fire management principles to improve decision making and firefighter safety.
>
> The Forest Service recognizes that the nature of the wildland fire environment is often dynamic, chaotic, and unpredictable. In such an environment, reasonable discretion in decision-making may be required. Thus, the body of procedures, best practices, concepts, and principles described in the listed publications should be considered the best guidance available for the majority of circumstances. Forest Service employees must use their best

> judgment in applying the guidance contained in these references to
> real-life situations.

Robertson Decl. Ex. A, at 7, 8, 14, ECF No. 12; see also 7–8; see also *Esquivel*, 21 F.4th at 575.

Because numerous provisions of the FSM are saturated with discretion, and finding Plaintiffs

have failed to present any contrary policy, the Court concludes that the first prong is met.

## II.    <u>Policy Considerations</u>

As to the second question—whether the Forest Service's choices were susceptible to a

policy analysis grounded in social, economic, or political concerned—the Court likewise finds in

the affirmative.

In *Esquivel*, the Ninth Circuit provided the following:

> Our decision in *Miller* makes clear that decisions regarding how to
> perform fire suppression operations are policy-based decisions
> covered by the discretionary function exception. . . . Since *Miller*
> establishes that decisions regarding *whether* and *how* to perform
> fire suppression operations are discretionary functions rooted in
> policy, the discretionary function exception extends to all other
> conduct "based upon the exercise or performance" of these
> operations.

*Esquivel*, 21 F.4th at 575–76 (emphasis added). The Court finds no reason in this matter to

depart from that holding.

It appears that the thrust of Plaintiffs' claims is not that the Forest Service's response to

the Beachie Creek fire violated some mandatory policy; it is that the Forest Service's response to

the Beach Creek fire conflicted with Plaintiffs' vision of the best course of action. Instead of

pointing to a definitive policy violation, Plaintiffs' brief dedicates pages to explaining how, from

their perspective, the Forest Service missed an opportunity to put out the fire in its early stages.

Plaintiffs may be right. But lacking the insight and expertise of the Forest Service, Plaintiffs are

ill-positioned to make that judgment call. Which is precisely the purpose of the discretionary

function exception: to protect the policy-based decisions of agencies best positioned to make

them. Because the challenged decisions fall within the discretionary function exception, this

court lacks jurisdiction and Plaintiffs' FTCA claims must be dismissed.

## **CONCLUSION**

Defendant's Motion to Dismiss, ECF No. 8, is GRANTED. This matter is dismissed with

prejudice and without leave to amend. Plaintiffs' Motion to Consolidate, filed at ECF No. 32 and

stayed at ECF No. 35, is accordingly DENIED as moot.


IT IS SO ORDERED.

DATED this 6th day of December, 2024.



_____s/Michael J. McShane_____
Michael J. McShane
United States District Judge